**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GRACE JONAS, JOSEPH MEYER, JAKE PAVLOW, and ERIK SCHALK, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CENTER STAGE COMEDY L.P.,<br><br>Defendant. | Case No.: |

## COMPLAINT

Plaintiffs Grace Jonas, Joseph Meyer, Jake Pavlow, and Erik Schalk, on behalf of themselves and all others similarly situated, complain of Center Stage Comedy L.P. as follows, on information and belief except as to their own experiences and matters of public record:

## INTRODUCTION

1.      "When shopping for a good or service, consumers want to know: how much?"[1]

2.      "Unfortunately, consumers face widespread and growing unfair and deceptive fee practices that make it much harder to find out" the answer to this basic question.[2]

3.      One such unfair and deceptive practice is called "drip pricing."

4.      "Drip pricing" is the practice of listing one price for a good or service up front, then adding one or more hidden "junk fees" to the total price just before the consumer decides to complete the transaction.

5.      Drip pricing is a form of dishonest bait-and-switch advertising.

6.      For this reason, it is prohibited by state and federal consumer protection laws.

---

[1] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,067 (Jan. 10, 2025).
[2] *Id.*

7.    Until very recently, Center Stage Comedy L.P., doing business as Helium Comedy Clubs ("Helium"), did just what the law prohibits. It listed one upfront price to entice consumers into making a purchasing decision, only to pull the rug out from under their feet at the last stage of the transaction by adding a hidden, mandatory junk fee when consumers have already decided to complete the transaction in reliance on the upfront price.

8.    Plaintiffs each purchased tickets to comedy shows at one of Helium's comedy clubs through its website. The prices of these tickets were misleadingly and unlawfully advertised as lower than the total prices Plaintiffs would pay after Helium smuggled in its junk fees just as they were completing the transactions.

9.    On their own behalf and on behalf of all other similarly injured consumers, Plaintiffs bring this action to remedy the injuries Helium's dishonest business practices have caused.

## JURISDICTION AND VENUE

10.    The Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332(d)(2) because the parties and putative class members are minimally diverse, the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and the number of all putative class members is at least 100.

11.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, and under § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

12.    Plaintiff Grace Jonas is a resident of Pennsylvania.

13.    Plaintiff Joseph Meyer is a resident of Missouri.

14.    Plaintiff Jake Pavlow is a resident of Pennsylvania.

15.     Plaintiff Erik Schalk is a resident of Indiana.

16.     Defendant Center Stage Comedy L.P. is a limited partnership organized under the laws of Pennsylvania with its principal place of business at 1290 S. Avignon Dr., Gladwyne, PA 19035.

17.     Defendant's sole general partner is Center Stage Comedy GP, LLC.

18.     The sole member of Center Stage Comedy GP, LLC, is Marc Grossman, a resident of Pennsylvania.

## FACTUAL ALLEGATIONS

### I.     Drip pricing harms consumers.

19.     "Hidden fees" refer to fees charged by sellers in consumer transactions that are obscured from the consumer.[3] Hidden fees are a kind of "junk fees."[4] Such fees are "mandatory but not transparently disclosed to consumers."[5] Consumers may be "lured in with the promise of a low price, but when they get to the register, they discover that price was never really available."[6] Hidden junk fees are thus "an evolution of bait-and-switch schemes."[7]

20.     The practice of disclosing hidden or junk fees "late in the buying process" is often called "drip pricing."[8] Using drip pricing, "firms advertise only part of a product's total price to

---

[3] *See* Fed. Trade Comm'n, *Bringing Dark Patterns to Light* 7 (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14 .2022%20-%20FINAL.pdf/.

[4] Fed. Trade Comm'n, *FTC Proposes Rule to Ban Junk Fees* (Oct. 11, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees/ (discussing "hidden fees" as a "junk fee practice[]").

[5] The White House, *The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition*, The White House (March 5, 2024), https://web.archive.org/web/20250118015252/https://www.whitehouse.gov/cea/written- materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine- competition/.

[6] *Id.*

[7] *Id.* n.2.

[8] *Bringing Dark Patterns to Light*, *supra* note 3, at 8–9.

lure in consumers."[9] Then, once "the consumer already has spent significant time selecting and finalizing a product or service plan to purchase," the mandatory junk fees are disclosed.[10]

21.     As an example of drip pricing of junk fees, the FTC has pointed to "'convenience fee[s]' that appear[] only when a shopper reaches the check-out screen":[11]



22.     Consumers "feel committed to a purchase" at this stage of the transaction and thus go through with it anyway, despite feeling "frustrated" that "they have no idea how much it costs until it's too late."[12] "Even when consumers who have experienced drip pricing are aware of the total price and are given the option to change their selection, many do not, despite being dissatisfied."[13]

23.     "[S]everal psychological mechanisms" are responsible for drip pricing's effectiveness at influencing consumer behavior. Once a consumer has committed to a purchase,

_____

[9] *Id.* at 8.
[10] *Id.* at 9.
[11] *Id.* at 23, 30.
[12] *Id.* at 9.
[13] U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 29 (Apr. 2022), https://assets.publishing.service.gov.uk/media/624c27c68fa8f527710aaf58/Online_choice_archit ecture_discussion_paper.pdf/.

"abandoning it" in the face of drip-priced junk fees "may cause feelings of uncertainty, dissatisfaction and cognitive dissonance." Drip pricing practitioners may "rely on the extra effort that would be required" for consumers to back out of the transaction at its last step, "such that consumers accept the price increasing later in the purchase process."[14]

24.     In turn, "[s]everal behavioural biases" drive these mechanisms, including "anchoring," or the tendency to "anchor on initial price information" without "fully adjust[ing]" one's "view of the price" once all mandatory fees are disclosed; the "sunk cost fallacy," or the tendency to "continue with a process if [consumers] have invested time or effort"; and the "endowment effect," or the tendency to "place a higher value on objects [consumers] own, or have imagined owning."[15]

25.     Drip pricing harms consumers.

26.     "Junk fees cost American families tens of billions of dollars each year and inhibit competition, hurting consumers, workers, small businesses, and entrepreneurs."[16]

27.     "Drip pricing has been shown in several experimental, theoretical and real-world contexts to lead consumers to buy more, overspend, underestimate the total price, make mistakes when searching, and be less happy with their purchases."[17]

28.     As one individual commenter put it to the FTC, drip pricing is "endless, ubiquitous and makes it extremely difficult for consumers to make informed decisions."[18]

---

[14] *Id.* at 30.
[15] *Id.*
[16] The White House, *Biden-Harris Administration Announces Broad New Actions to Protect Consumers From Billions in Junk Fees* (Oct. 11, 2023), https://web.archive.org/web/20250118020934/https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/11/biden-harris-administration-announces-broad-new-actions-to-protect-consumers-from-billions-in-junk-fees/.
[17] *Online Choice Architecture*, *supra* note 13, at 30.
[18] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,067 (Jan. 10, 2025).

29.     As another individual commenter put it to the FTC, "It's one thing to be on guard when walking down a dark alley, but being on guard every time you want to take a vacation, go to a concert, fly home to see a sick loved one—that's just not fair."[19]

30.     "Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction."[20]

31.     According to one study, consumers who were not shown full prices, including mandatory fees, at the beginning of a transaction "ended up spending about 20% more money and were 14% more likely to complete [it]" than consumers to whom junk fees were disclosed up front.[21]

32.     Another study found that consumers "based their purchase decision exclusively on the base price," that is, the price before hidden fees were added.[22]

33.     Drip pricing thus causes consumers to "spend more than they intend, choose unsuitable products and waste their time."[23]

34.     Drip pricing harms honest businesses, too.

35.     An "honest business that sets forth the total price of its product at the outset will be at a significant disadvantage when compared to a seller that advertises an artificially low price to draw consumers in, then adds mandatory charges late in the transaction."[24]

---

[19] *Id.*

[20] *Bringing Dark Patterns to Light*, *supra* note 3, at 9.

[21] *Id.*

[22] Alexander Rasch, Miriam Thöne, Tobias Wenzel, *Drip Pricing and Its Regulation: Experimental Evidence*, 176 J. Econ. Behavior & Org. 353 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189/, *pre-print available at* https://www.econstor.eu/bitstream/10419/181760/1/1029741549.pdf/.

[23] *Online Choice Architecture*, *supra* note 13, at 30.

[24] *Bringing Dark Patterns to Light*, *supra* note 3, at 9.

36.     Drip pricing thereby harms free and fair competition.

37.     "Since consumers are more likely to choose products based on characteristics they find most salient, businesses will tend to compete harder on those characteristics and less hard on less salient characteristics." Mandatory fees disclosed only at the final stages of a transaction are definitionally "less salient" than up-front prices, and therefore generate "little to no competition."[25]

38.     One experimental study found that sellers "set the highest possible drip price, and compete only on base prices."[26]

39.     For this reason, drip pricing is difficult or impossible to correct using only market pressures.[27]

40.     The law must intervene.[28]

## II.   State and federal consumer protection laws protect consumers against drip pricing.

41.     "There is nothing new about businesses using bait-and-switch tactics to reel in and deceive consumers,"[29] and likewise nothing new about the protection afforded against such tactics by state and federal consumer protection laws.

42.     Pennsylvania consumer protection law prohibits "[a]dvertising goods or services with intent not to sell them as advertised" and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."[30]

---

[25] *Online Choice Architecture*, *supra* note 13, at 30.
[26] *Drip Pricing and Its Regulation*, *supra* note 22.
[27] *Online Choice Architecture*, *supra* note 13, at 31 ("Where there are enough consumers who do not detect and avoid drip pricing, competitive pressures may also not be sufficient to incentivise businesses to educate or provide more upfront price information to consumers.").
[28] *See id.* (discussing regulatory interventions).
[29] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,067 (Jan. 10, 2025).
[30] 73 Pa. Stat. § 201-2(ix), (xxi)

43.    Missouri consumer protection law prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact."[31]

44.    Indiana consumer protection law prohibits "any unfair, abusive, or deceptive act, omission, or practice."[32]

45.    Collectively, these consumer protection laws prohibit bait-and-switch tactics designed to extract additional value from consumers, over and above advertised prices, through deceit and psychological manipulation.

46.    Federal law likewise prohibits dishonest bait-and-switch advertising like drip pricing. Section 5(a) of the FTC Act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."[33]

47.    The FTC has brought enforcement actions against drip pricing practices for violating Section 5(a). For example, in *Federal Trade Commission v. Liberty Chevrolet, Inc.*, the agency alleged among other things that a car dealership advertised "vehicles for sale at a specific price but then fail[ed] to honor those prices."[34] The dealership falsely represented that consumers could purchase cars for advertised prices that "failed to include an additional certification fee."[35] Consumers would invariably find that the advertised car could "only be purchased for a higher price" that included the fee.[36] The dealership thereby "charge[d] consumers higher sales prices

---

[31] Mo. Stat. § 407.020(1).
[32] Ind. Code § 24-5-0.5-3(a).
[33] 15 U.S.C. § 45(a).
[34] Compl. ¶ 10, *Fed. Trade Comm'n v. Liberty Chevrolet, Inc.*, No. 1:20-cv-03945-PAE (S.D.N.Y.), ECF No. 7.
[35] *Id.* ¶ 11.
[36] *Id.*
[37] *Id.*

than advertised"[37] in violation of Section 5(a).[38]

48.    The FTC has also warned businesses that drip pricing invites Section 5(a) enforcement. For example, the agency has warned hotel operators that failure to disclose mandatory fees up front "may violate the law by misrepresenting the price consumers can expect to pay for their hotel rooms."[39]

49.    In furtherance of its authority "to define with specificity unfair or deceptive acts or practices" under the FTC Act, the FTC has recently promulgated a Rule on Unfair or Deceptive Fees, which prohibiting drip pricing in the live-event ticketing and short-term lodging industries specifically—two industries in which "there is a long history of consumer harm."[40]

### III.    Helium's website has dishonestly baited consumers using drip pricing.

50.    Helium has charged consumers a junk "service charge" as part of a deceptive drip pricing scheme when they purchased tickets from Helium's website.

51.    Helium never disclosed to consumers that they would be assessed a service charge until after they had already selected their tickets and were advertised a base ticket price.

52.    Helium never disclosed the "service" purportedly paid for by the "service charge." There was no additional "service" being provided at the time of checkout.

---

[37] *Id.*

[38] *Id.* ¶¶ 35–37. The case settled for $1,500,000 in consumer refunds and permanent injunctive relief. *See Fed. Trade Comm'n v. Liberty Chevrolet, Inc.*, No. 1:20-cv-03945-PAE (S.D.N.Y.), ECF Nos. 15–16.

[39] Fed. Trade Comm'n, *Model Warning Letter* 1 (Nov. 2012), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/121128hoteloperatorsletter.pdf/; *see* Fed. Trade Comm'n, *FTC Warns Hotel Operators that Price Quotes that Exclude 'Resort Fees' and Other Mandatory Surcharges May Be Deceptive* (Nov. 28, 2012), https://www.ftc.gov/news-events/news/press-releases/2012/11/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/.

[40] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,077 (Jan. 10, 2025).

53. Helium was merely assessing a junk fee and requiring consumers to pay-to-pay for their tickets.

54. When a consumer visited Helium's website, on the main page, she was asked to select a "club site":



55. After the consumer selected a club site, she could view upcoming shows at that site:



56. The purchase process began when the consumer selected "Buy Tickets" under the show she wanted to attend.

57. The consumer was then taken to the selected event's ticket page, which displayed two prices for tickets:



58.     No required service charge was mentioned.

59.     The consumer entered the number of tickets she wanted to purchase and clicked the "Proceed" button.



60.

61.     No required service charge was mentioned.

62.    After the consumer clicked the "Upgrade" or "No Thanks, Add to Cart" button, she was taken to her "Shopping Cart," which again listed the base price of the ticket:



63.    No required service charge was mentioned.

64.    So much for the bait. Now the switch.

65.    The consumer clicked "Proceed to Checkout."

66.    For the first time, a $6.99 per-ticket "service charge" appeared:



67.    Only now—after seeing the base ticket price, being given the option to accept or reject additional charges for additional services, and seeing the base ticket price again, and likely

after investing significant time in selecting the location, date, performer, and number of tickets of her choice—was the full price of the transaction revealed to the consumer.

**IV.    Plaintiffs are victims of Helium's deceptive drip pricing practices.**

68.    On January 11, 2025, Plaintiff Jonas purchased a ticket for a comedy show at Helium's Philadelphia comedy club from her home in Pennsylvania on Helium's website.

69.    The purchase totaled $102.44.

70.    Helium initially advertised the ticket for $89.

71.    Helium charged Jonas a mandatory $8.99 "service charge" that was not initially disclosed and $4.45 in taxes.

72.    Jonas was not aware that the advertised price excluded a mandatory $8.99 junk fee when she first selected the ticket.

73.    Jonas believed that the initially listed $89 price would be the actual price she would pay. In other words, Jonas believed the $89 price included all mandatory fees (excluding taxes).

74.    Jonas relied on the listed $89 price in comparing Helium's offering to other available entertainment offerings, and in her initial purchasing decision.

75.    Because Helium's junk fee was variable and disclosed at the last step of the transaction, Jonas was unable to compare the costs of Helium's tickets to the cost of attending other ticketed events.

76.    On April 11, 2024, Plaintiff Meyer purchased three tickets for a comedy show at Helium's St. Louis comedy club from his home in Missouri on Helium's website.

77.    The purchase totaled $97.11.

78.    Helium initially advertised one ticket at $24, or $72 for three.

79.    Helium charged Meyer a mandatory $5.99 per-ticket "service charge," totaling $17.97, that was not initially disclosed and $7.14 in taxes.

80.    Meyer was not aware that the advertised price excluded a mandatory $5.99 per-ticket junk fee when he first selected the tickets.

81.    Meyer believed that the initially listed $24 per-ticket price would be the actual price he would pay. In other words, Meyer believed the $24 price included all mandatory fees (excluding taxes).

82.    Meyer relied on the listed $24 price in comparing Helium's offering to other available entertainment offerings, and in his initial purchasing decision.

83.    Because Helium's junk fee was variable and disclosed at the last step of the transaction, Meyer was unable to compare the costs of Helium's tickets to the cost of attending other ticketed events.

84.    On July 31, 2024, Plaintiff Pavlow purchased two tickets for a comedy show at Helium's Philadelphia comedy club from his home in Pennsylvania on Helium's website.

85.    The purchase totaled $58.18.

86.    Helium initially advertised one ticket at $22, or $44 for two.

87.    Helium charged Pavlow a mandatory $5.99 per-ticket "service charge," totaling $11.98, that was not initially disclosed and $2.20 in taxes.

88.    Pavlow was not aware that the advertised price excluded a mandatory $5.99 per-ticket junk fee when he first selected the tickets.

89.    Pavlow believed that the initially listed $22 per-ticket price would be the actual price he would pay. In other words, Pavlow believed the $22 price included all mandatory fees (excluding taxes).

90.     Pavlow relied on the listed $22 price in comparing Helium's offering to other available entertainment offerings, and in his initial purchasing decision.

91.     Because Helium's junk fee was variable and disclosed at the last step of the transaction, Pavlow was unable to compare the costs of Helium's tickets to the cost of attending other ticketed events.

92.     On December 13, 2024, Plaintiff Schalk purchased a ticket for a comedy show at Helium's Indianapolis comedy club from his home in Indiana on Helium's website.

93.     The purchase totaled $31.99.

94.     Helium initially advertised the ticket at $26.

95.     Helium charged Schalk a mandatory $5.99 "service charge" that was not initially disclosed.

96.     Schalk was not aware that the advertised price excluded a mandatory $5.99 junk fee when he first selected the ticket.

97.     Schalk believed that the initially listed $26 price would be the actual price he would pay. In other words, Schalk believed the $26 price included all mandatory fees.

98.     Schalk relied on the listed $26 price in comparing Helium's offering to other available entertainment offerings, and in his initial purchasing decision.

99.     Because Helium's junk fee was variable and disclosed at the last step of the transaction, Schalk was unable to compare the costs of Helium's tickets to the cost of attending other ticketed events.

100.    All four Plaintiffs were induced to pay Helium's junk "service charge" by Helium's carefully engineered drip pricing scheme that lured them with one listed price and required them to invest significant time and effort finalizing their purchase decisions before springing the junk fee on them at a point in the process at which Helium anticipated Plaintiffs

would be highly unlikely to abandon the transaction.

## CLASS ALLEGATIONS

101.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23, on behalf of themselves and all others similarly situated.

102.    Subject to future amendment or revision, Plaintiffs Jonas and Pavlow seek to represent the following putative class ("Pennsylvania Class"):

> All Pennsylvania residents who purchased tickets on Helium's
> website between the date six years before this Complaint is filed
> and April 16, 2025.

103.    Subject to future amendment or revision, Plaintiff Meyer seeks to represent the following putative class ("Missouri Class"):

> All Missouri residents who purchased tickets on Helium's website
> between the date five years before this Complaint is filed and April
> 16, 2025.

104.    Subject to future amendment or revision, Plaintiff Schalk seeks to represent the following putative class ("Indiana Class"):

> All Indiana residents who purchased tickets on Helium's website
> between the date two years before this Complaint is filed and April
> 16, 2025.

105.    Excluded from the Classes are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiffs; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

106.    The Classes are so numerous that joinder of all of their members is impracticable, as Plaintiffs estimate their numbers to be in the thousands.

107.    There are questions of law and fact common to the Classes, including without limitation (a) whether Defendant has charged hidden junk fees through drip pricing; (b) whether Defendant's conduct violates applicable state consumer protection laws (c) whether Defendant's conduct was false or misleading; and (d) whether Defendant has been unjustly enriched by its violation of Plaintiffs' rights.

108.    Plaintiffs' claims are typical of the Classes'. Plaintiffs and Class members share the same rights under their respective states' laws, which Defendant has injured in the same way by charging illegal junk fees through drip pricing.

109.    Plaintiffs will fairly and adequately protect the Classes' interests, as Plaintiffs share their interest in avoiding illegal drip pricing; have no interest adverse to them; and have retained competent counsel experienced in consumer protection and class action litigation.

110.    The questions of law and fact common to Plaintiffs and the Classes predominate over any individualized questions because, among other reasons, Defendant has violated their rights under the same laws by the same conduct.

111.    A class action is superior to other available methods for adjudicating this controversy because, among other reasons, the claims at issue may be too small to justify individual litigation.

## CLAIMS TO RELIEF

### COUNT I
**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law,**
**Pa. Stat. § 201-3(a)**
**On behalf of the Pennsylvania Class**

112.    Plaintiffs reallege paragraphs 1–100 above.

113.    Defendant advertised goods or services with intent not to sell them as advertised by advertising one up-front price not available to any consumer and charging a different, higher price, which included a hidden, mandatory fee.

114.    Defendant engaged in fraudulent or deceptive conduct which created a likelihood of confusion or of misunderstanding by advertising one up-front price not available to any consumer and charging another, which included a hidden, mandatory fee.

115.    Plaintiffs suffered ascertainable loss as a result of Defendant's practices in that they paid money they otherwise would not have absent Defendant's practices and faced higher prices on Defendant's website and from other sellers than they would have absent Defendant's practices, because honest sellers cannot fairly compete with Defendant's misleadingly low prices and because Defendant's deceptive drip pricing stifles competition on mandatory fees.

116.    Defendant's drip pricing was a willfully deceptive practice because it was the result of intentional design choices intended to bait consumers.

117.    For Defendant's violation of the Unfair Trade Practices and Consumer Protection Law, Plaintiffs seek actual damages or $100, whichever is greater, trebled.

**COUNT II**
**Violation of the Missouri Merchandising Practices Act,**
**Mo. Stat. § 407.020(1)**
**On behalf of the Missouri Class**

118.    Plaintiffs reallege paragraphs 1–100 above.

119.    Defendant employed a deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealed, suppressed, or omitted a material fact by advertising one up-front price not available to any consumer and charging a different, higher price, which included a hidden, mandatory fee.

120.    Plaintiff acted as a reasonable consumer would in light of all circumstances around Defendant's intentional psychological manipulation through drip-pricing tactics.

121.    Defendant's drip pricing would cause a reasonable person to enter into the transaction that resulted in damages because it is designed to and does operate as a form of bait-and-switch advertising that exploits consumers' psychology.

122.    Plaintiff suffered ascertainable loss as a result of Defendant's practices in that he paid money he otherwise would not have absent Defendant's practices and faced higher prices on Defendant's website and from other sellers than he would have absent Defendant's practices, because honest sellers cannot fairly compete with Defendant's misleadingly low prices and because Defendant's deceptive drip pricing stifles competition on mandatory fees.

123.    Plaintiff's damages can be established with sufficiently definitive and objective evidence to allow the loss to be calculated with a reasonable degree of certainty in the amount of the entire purchase price, the hidden, mandatory fee, or the price premium paid as a result of Defendant's deceptive and unfair practice.

124.    Defendant's drip pricing was a willfully deceptive practice because it was the result of intentional design choices intended to bait consumers.

125.    For Defendant's violation of the Merchandising Practices Act, Plaintiff seeks actual and punitive damages.

**COUNT III**
**Violation of the Indiana Deceptive Consumer Sales Act,**
**Ind. Code § 24-5-0.5-3(a)**
**On behalf of the Indiana Class**

126.    Plaintiffs reallege paragraphs 1–100 above.

127.    Defendant engaged in an unfair, abusive, or deceptive act, omission, or practice by advertising one up-front price not available to any consumer and charging a different, higher

price, which included a hidden, mandatory fee.

128.    Plaintiff relied Defendant's falsely advertised base price in entering into the transaction with Defendant.

129.    Defendant's drip pricing was a willfully deceptive practice because it was the result of intentional design choices intended to bait consumers.

130.    For Defendant's violation of the Deceptive Consumer Sales Act, Plaintiff seeks actual damages or $500, whichever is greater, trebled.

**COUNT IV**
**Unjust Enrichment**
**Pennsylvania, Missouri, and Indiana Common Law**
**On behalf of all Classes**

131.    Plaintiffs reallege paragraphs 1–100 above.

132.    Defendant received a benefit at Plaintiffs' expense when Plaintiffs paid the junk "service fee" Defendant charged.

133.    Defendant has unjustly retained the benefit Plaintiffs conferred on it because Defendant procured the benefit through unlawful and misleading drip pricing, as well as through the oppressive psychological mechanisms on which drip pricing depends.

134.    For Defendant's unjust enrichment, Plaintiffs seek restitution of the benefits they paid and Defendant unjustly retained.

**PRAYER FOR RELIEF**

135.    Plaintiffs ask the Court to

a.    Certify this action as a class action under Federal Rule of Civil Procedure 23, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

b.    Enter a final judgment in Plaintiffs' and the Classes' favor that

        i.      Awards treble actual or statutory damages to Plaintiffs and the Classes, according to proof;

        ii.      Awards restitution to Plaintiffs and the Classes, according to proof, and

        iii.      Awards pre- and post-judgment interest, as allowed by law;

      c.      Award Plaintiffs and their counsel their reasonable costs and fees incurred in prosecuting this action, as allowed by law;

      d.      Order such further relief as the Court deems appropriate.

### JURY DEMAND

136.    Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 28, 2025

Respectfully submitted,

*/s/ Patrick Howard*

Patrick Howard (PA Atty ID 88572)
**SALTZ MONGEULZZI & BENDESKY PC**
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Tel: (215) 575-3895
phoward@smbb.com

Lynn A. Toops*
Ian R. Bensberg*
**CohenMalad, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel.: (317) 636-6481
ltoops@cohenmalad.com
ibensberg@cohenmalad.com

Christopher D. Jennings*
Tyler B. Ewigleben*
**Jennings & Earley PLLC**
500 President Clinton Avenue
Little Rock, AR 72201
chris@jefirm.com
tyler@jefirm.com

*Attorneys for Plaintiff*
* Application for admission *pro hac vice*
*forthcoming*